# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

| | |
|---|---|
| MAYA HOTEL INC., RUXMANI HOTELS, INC.<br> and SHARDAMAYA INC. d/b/a COMFORT<br>INN UNIVERSITY,<br><br>   Plaintiffs,<br>v.<br><br>OWNERS INSURANCE CO.,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DAMAGES AND JURY DEMAND

Plaintiffs MAYA HOTEL, INC. ("MAYA"), RUXMANI HOTELS, INC. ("RUXMANI") and SHARDAMAYA, INC. ("SHARDAMAYA") d/b/a COMFORT INN UNIVERSITY (collectively, "Plaintiffs"), by and through the undersigned counsel, file this Complaint for damages against defendant OWNERS INSURANCE CO. (hereinafter, "INSURER") and state as follows:

## JURISDICTION AND VENUE

1. The subject cause of action occurred in Wilmington, New Hannover County, North Carolina, and appropriate venue is in the Wilmington Division of this Court.

2. The Court has jurisdiction under 28 U.S.C. § 1332 in that the amount in controversy in over $75,000 and the parties are domiciled in different states.

## PARTIES

3. At all times relevant herein, MAYA is and has been a North Carolina business corporation with its principal place of business in North Carolina.

4. At time relevant herein, RUXMANI and SHARDAMAYA are and have been

Case 7:21-cv-00154-M   Document 1   Filed 09/14/21   Page 1 of 21

North Carolina corporations with their principal place of business in North Carolina.

5.     At all times relevant herein, MAYA and SHARDAMAYA has maintained common shareholders, as well as the same majority shareholder and President, and RUXMANI has managed the operations thereof.

6.     At all times relevant herein, SHARDAMAYA has owned and operated a Comfort Inn hotel located at 151 S. College Rd., Wilmington, North Carolina, and has done business in the name "Comfort Inn University" (hereinafter, the "Hotel").

7.     INSURER is a Michigan-based property and casualty insurance company with its principal place in business in Lansing, Michigan, but is an authorized property and casualty insurer in North Carolina.

## GENERAL ALLEGATIONS

8.     On or about March 1, 2015, the President of MAYA, RUXMANI and SHARDAMAYA purchased a policy of commercial property insurance from INSURER under Policy Number 184615-35302816-18 (the "Policy"), which covered ten individual hotels in three states, with different corporate owners, but common shareholders and the same majority shareholder and President, including the Hotel. [A true and accurate copy of the purported Policy applicable to the date of loss is attached hereto and incorporated herein as Exhibit "A".]

9.     The Policy included separate policy declarations for each hotel, and provided Building replacement cost coverage for the Hotel (location 003) with general policy limits of $6,120,000.00, including additional Ordinance or Law coverage; replacement cost Personal Property coverage with general policy limits of $1,000,000.00; and Hotel Plus Premier Coverage Package for Building and Personal Property, among others.

10.    At the time of purchasing the Policy, Plaintiffs reasonably relied upon Insurer in

determining necessary and proper coverages for the Hotel, including but not limited to the identification of the 'insured" as well as the proper replacement cost of the Hotel for purposes of the coinsurance requirements in the policy.

11.     Plaintiffs have an insurable interest in the Hotel, and have further satisfied their co-insurance requirement, as determined by INSURER.

12.     Plaintiffs have paid all Policy premiums that have become due during the initial term, and all subsequent renewal terms thereafter.

13.     Accordingly, INSURER has provided continuous coverage under the Policy for Plaintiffs and the Hotel through the present time.

14.     On or about September 15, 2018, Hurricane Florence made landfall in the Wilmington, North Carolina area with sustained winds, causing devastation to the community, and substantial wind damage and resulting loss to the Hotel.

15.     Within a few days of the storm, Plaintiffs made a claim for loss from Hurricane Florence and related wind damage with INSURER, who assigned it claim number 300-0285372-2018 with a date of loss of September 15, 2018 (the "Claim").

16.     The Policy, in pertinent parts, provided building and personal property coverage as follows:

### A. COVERAGE
We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
(a) **Covered Property**
   Covered Property, as used in this Coverage Part, means the type of property described in Section **A.1.**, and limited in **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.
   a. **Building**, meaning the building or structure described in the Declarations, including:
      (1) Completed additions;
      (2) Fixtures, including outdoor fixtures;
      (3) Permanently installed:

(a) Machinery; and
(b) Equipment;
(4) Building glass, meaning glass that is part of the building or structure;
(5) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:
(a) Fire-extinguishing equipment;
(b) Outdoor furniture;
(c) Floor coverings; and
(d) Appliances used for refrigerating, ventilating, cooking, dishwashing, or laundering; and
(6) If not covered by other insurance:
(a) Additions under construction, alterations and repairs to the building or structure; and
(b) Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

(c) Your Business Personal Property located in or on the building described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property - Separation of Coverage endorsement:
    i. Furniture and fixtures;
    ii. Machinery and equipment;
    iii. "Stock";
    iv. All other personal property owned by you and used in your business;
    v. Labor, materials, or services furnished or arranged by you on personal property of others;
    vi. Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations, or additions:
(d) Made a part of the building or structure you occupy but do not own; and
(e) You acquired or made at your expense but cannot legally remove; and
(f) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property of Others.


17.    Pursuant to the terms of the Policy and Declarations, windstorm damage is a covered cause of loss.

18.    The Policy further provided the following duties of Plaintiffs in the event of loss or damage:

  a. You must see that the following are done in the event of loss or damage to Covered Property:
(1) Notify the police if a law may have been broken.
(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

4 of 21

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values, and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request.

We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

**b.** We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

19.    On or about September 20, 2018, Plaintiffs arranged an inspection of the Hotel damages with INSURER's adjuster. At that time, the Hotel had no power, was consumed by wind and water damages throughout, and was filled people.

20.    After a cursory inspection, INSURER's adjuster indicated that he would return due to the extent of the damage and the size of the building, and that he would be bringing ServPro to assist with a portion of the loss.

21.    On or about September 21, 2018, INSURER's adjuster returned with an employee of ServPro, who was brought to the HOTEL by INSURER to perform an inspection of damages and to prepare an estimate for demolition and the mitigation of damages.

22.    After ServPro completed its inspection, INSURER's adjuster directed Plaintiffs to execute an authorization for ServPro to perform demolition and mitigation work.

23.     ServPro informed Plaintiffs that they would pay nothing out of pocket, as INSURER would be paying for all of the work.  ServPro further advised Plaintiffs that all hotel guests would have to be removed before the mitigation work began.

24.     Plaintiffs signed an authorization for ServPro to begin the demolition and mitigation work because ServPro refused to provide Plaintiffs with an inspection report or estimate without Plaintiffs signing the authorization, and INSURER's adjuster warned that INSURER may not cover the loss if the ServPro's demolition and mitigation work wasn't begun.

25.     As a result of the HOTEL being filled with guests, and additional commitments already made by Plaintiffs, Plaintiffs requested that the demolition and mitigation work be delayed a few days, however, INSURER's adjuster advised that delaying ServPro's demolition and mitigation work could affect INSURER's coverage for the loss. As a result, Plaintiffs cleared the Hotel of Guests and authorized ServPro to begin demolition and mitigation work on or about September 25, 2018.

26.     After being authorized to begin demolition and mitigation work, ServPro worked directly with INSURER in determining the nature and extent of demolition and mitigation work to be performed in the Hotel.  ServPro and INSURER came to an agreed plan for demolition and mitigation of the Hotel based upon ServPro's recommendations.

27.     On or about October 4, 2018, INSURER's adjuster and ServPro agreed that all affected areas from the water intrusion should be demolished and removed, due to concerns about mold.

28.     Despite being told the INSURER would be paying all of ServPro's demolition and mitigation costs, Plaintiffs began receiving invoices from ServPro, which quickly exceeded $1 million.

29. On or about October 9, 2018, Plaintiffs retained Indiana Public Adjusting Inc. and Jay Hatfield ("IPA") to assist with the handling of the claim.

30. On or about October 11, 2018, IPA met with INSURER'S adjuster and ServPro at the Hotel. During that meeting, the ServPro employee confirmed that INSURER's adjuster had agreed to pay ServPro's bill, which was estimated to be in excess of $1 million. INSURER further agreed to submit an advance payment toward future permanent repairs that was not intended for ServPro's demolition and mitigation work.

31. On October 18, 2018, IPA received an emailed copy of a letter from INSURER, dated October 18, 2018, which outlined INSURER's claim investigation to date. The letter indicated Plaintiffs would be sent a check for $750,000.00 toward repairs, without any itemization for the same, or indicating whether the funds were to be used for the ServPro work or for permanent repairs. INSURER further refused to provide Plaintiffs an advance payment toward business income coverage, despite having compelled Plaintiffs to vacate all occupants for demolition and mitigation work. Finally, INSURER failed to acknowledge that Plaintiffs' loss was covered under the Policy and insisted that its investigation of the loss continued.

32. On October 18, 2018, INSURER's adjuster confirmed via text that the $750.000.00 advance payment was above and beyond the ServPro work, and the amount did not reflect any amounts due to ServPro for its work.

33. On October 19, 2018, IPA submitted a repair estimate for Plaintiff's roof only. The estimate further acknowledged that INSURER would not be assuming responsibility for the repair work and that Plaintiffs would be hiring its own contractor to begin the work once the advance payment arrived.

34. Later that day, IPA was informed by ServPro that INSURER was not paying their

invoices as INSURER had agreed, and that ServPro was going to stop their demolition and mitigation work until they were paid by INSURER or Plaintiffs.

35.     IPA called INSURER's supervising adjuster and informed her that ServPro was refusing to continue doing the necessary demolition and mitigation work because INSURER was not making payment as promised. The supervising adjuster stated that INSURER had the right to make payment when it chose to do so, and further disparaged IPA's adjuster and its work. She further claimed that Plaintiffs were not mitigating damages and was threatening coverage for the loss accordingly. She also claimed that they would not pay for the damaged contents that were disposed of by ServPro.

36.     On October 21, 2018, IPA sent a detailed letter to INSURER's supervising adjuster as IPA still had not received the promised letter or advance from INSURER, and further detailed the numerous misrepresentations made by the supervising adjuster.

37.     On October 24, 2018, IPA received a second letter from INSURER, suggesting that Plaintiffs could use the advance funds for ServPro's mitigation work, but that payment of the same would not be binding upon INSURER regarding the amount to be paid. In the letter, INSURER confirmed that they did not intend to assume responsibility to "repair, rebuild or replace the property with other property of like kind and quality" on its own, as was its option under the Policy. The letter further made several misrepresentations, including but not limited to the following:

> a.   that INSURER did not approve of or agree to pay for ServPro's mitigation work, and
>
> b.   that IPA advised INSURER that Plaintiffs would "stop mitigation work until "INSURER" issues payment on the invoices submitted by

ServPro"

38.     On November 2, 2018, IPA submitted to INSURER a proof of loss specific to the roof damages only.

39.     On November 6, 2018, IPA submitted to INSURER a proof of loss specific to elevator damage.

40.     ServPro ultimately stopped the demolition and mitigation work before completing it because INSURER failed and refused to make payment despite having agreed to the full scope of work at the outset. Ultimately, ServPro did not complete the demolition and mitigation of the 2nd, 3rd and 4th floor of the Hotel, which they estimated would cost in excess of $300,000.00 over and above their invoice for completed work.

41.     Thereafter, INSURER brought in Harrison Jones ("Jones") from Restoration Associates, Inc., who was purported to be a "roof consultant".

42.     After multiple requests from IPA, on November 26, 2018, INSURER authorized Plaintiffs to proceed with the demolition and mitigation work for the remaining floors of the Hotel without the presence of Jones and INSURER again reminded IPA that it would not take responsibility if Plaintiffs failed to mitigate their damages. INSURER further approved Plaintiffs' proof of loss for the roof only.

43.     Since ServPro refused to do any more work on the Hotel due to INSURER's actions, Plaintiffs had to hire a new mitigation contractor to complete the demolition and mitigation of the remaining floors. IPA again asked if INSURER wanted to assume responsibility for the repairs, but INSURER refused.

44.     Due to the extent of the damage in the area, and the amount of repairs being undertaken, finding a contractor willing and able to complete such work was extraordinarily

difficult.

45. On December 5, 2018, INSURER acknowledged that it had received a proper proof of loss specific to the elevator damage, but was disputing the amount for the repairs.

46. Also on December 5, 2018, IPA submitted a proof of loss for the repairs completed by ServPro, as well as additional information supporting the elevator claim.

47. On December 10, 2018, IPA submitted a proof of loss for exterior damages.

48. On or about December 20, 2018, INSURER's adjuster submitted a letter to IPA. In the letter, INSURER indicated that the demolition and mitigation plan, which they had previously accepted, would be changed to remove significant amounts of the agreed demolition work. Specifically, INSURER suggested that the drywall damage and associated demolition did not appear to be related to the September 15, 2018, loss.

49. On January 29, 2019, INSURER submitted to IPA a letter indicating that INSURER's estimate to repair the building was $1,331,591.18, and that repairs should be completed by June 30, 2019. The letter included an estimate prepared by Jones, which included a substantially different scope of loss than what was originally identified by ServPro and agreed by INSURER. The estimate further did not include additional damages identified during the construction process. Further, the Jones estimate did not even include the demolition and mitigation that had not been completed by ServPro when it left the job, but was part of the original agreed plan. Ultimately, Jones' estimate did not include significant amounts of storm damage that was evident in the inspection.

50. On March 1, 2019, IPA submitted a proof of loss for building damages and personal property.

51. On March 29, 2019, INSURER's adjuster submitted a letter to IPA acknowledging

compliance with Plaintiffs' obligation to submit a proof of loss, but disputing the amount therein. Again, the letter makes clear that INSURER disputed scope of loss claimed, as well as coverage for significant amounts of the claimed loss and insisted that INSURER would not pay more than the estimate prepared by Jones. INSURER further indicated that they would have a representative on site to document the extent of the repairs.

52.     From the very outset of the claim, INSURER has continued to warn Plaintiffs that they had an obligation to mitigate damages from the loss, and that they would not cover damages caused by the failure to do so.

53.      In order to comply with the Policy requirements and the duty to mitigate damages, Plaintiffs' contractor began work completing the remaining demolition and mitigation work, as well as permanent repairs to the Hotel before there could be a full agreement with the scope of loss, coverage, and amounts due under the Policy.

54.     Throughout the course of the repair work, INSURER requested copies of receipts and documentation regarding the cost of completed repairs, and IPA submitted the same in accordance with INSURER's request.

55.     Throughout the course of the repair work, IPA continue to ask INSURER's adjuster to come to the Hotel to inspect the work, but he failed and/or refused to do so.

56.     Throughout the course of the claim, ServPro and/or IPA continued to invite INSURER's adjuster to come see the damaged personal property, but he failed and/or refused to do so until said property was disposed of. INSURER then attempted to justify its refusal to pay for the personal property because the property was no longer available for inspection.

57.     The Policy included provisions regarding the payment of the loss as follows:

**Loss Payment**

(a) In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

(3)Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable pro- vision which amends or supersedes the Valuation Condition.

(b) The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

(c) We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

(d) We will not pay you more than your financial interest in the Covered Property.

(e) We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

58.     Plaintiffs have requested replacement cost benefits under the policy for their actual cost in making the repairs, and have fully complied with all conditions under the Policy for receiving the same.

59.     Despite Plaintiffs compliance and entitlement to such coverage benefits, INSURER has failed and refused to pay the same in accordance with the Policy.

60.     In June of 2020, IPA sent INSURER copies of all receipts and documentation for the completed repair work, much of which had been previously submitted to insurer.

61.     IPA further submitted additional receipts and documentation for the completed repair work on July 31, 2020, and September 16, 2020.

62.     However, INSURER admittedly denied replacement cost benefits to Plaintiffs

without ever even considering the receipts and documentation they had received.

63. On November 3, 2020, INSURER retained counsel, who indicated that it was his job to review the documentation and determine if adjustments from Jones' estimate should be made, and to provide an explanation if INSURER denied the same.

64. In response to INSURER's counsel request, on February 13, 2021, IPA resubmitted all receipts and other documentation showing all of the amounts actually spent for the Hotel repairs, as well as a letter detailing and itemizing all of the costs and how they pertained to the claim.

65. On April 28, 2021, INSURER's counsel responded to IPA's production that the production did not change INSURER's position, and disputes regarding the scope of loss and coverage issues precluded further payment from INSURER to Plaintiffs other than approximately $60,000.00 in expenses relating to the elevators.

66. Thereafter, IPA demanded an appraisal of the loss pursuant to the Policy.

67. The Policy included an appraisal provision as follows:

The **Appraisal** Loss Condition is replaced by the following:

**Appraisal**
If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. You and we must notify the other of the appraiser selected within 20 days of the written demand for appraisal. The two appraisers will select a competent and impartial umpire. If the appraisers do not agree on the selection of an umpire within 15 days, they must request selection of an umpire by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be the appraised value of the property or amount of the loss. If you make a written demand for an appraisal of the loss, each party will:

(a)     Pay its chosen appraiser; and
(b)     Bear the other expenses of the appraisal and umpire equally.

68.     While INSURER has proceeded with an appraisal, it has refused to change its position on the scope of loss and coverage for substantial amounts of repairs.

69.     Furthermore, INSURER has insisted that Jones be its appraiser, despite his ongoing working relationship with INSURER, his prior involvement with the claim, and his estimate being used as the basis for INSURER disputing the scope of loss and its refusal to extend coverage for necessary repairs that were made to the HOTEL.

70.     As a result of North Carolina Law, the appraisal cannot determine scope of coverage disputes, and the appraiser appointed by INSURER cannot be impartial as required by the Policy.

71.     Throughout the course of the claim, IPA has attempted to work with INSURER to come to an agreed scope of loss and damage estimate, without success.

72.     Since initiating the Claim, Plaintiffs, either individually or through IPA has produced all documentation requested by INSURER and/or its agents and representatives, to the extent that the documents were in its possession or could be obtained through other sources.

73.     Plaintiffs, individually and by IPA, have fully complied with all terms and conditions precedent under the Policy pertaining to the provision of coverage and/or the issuance of payment for all losses identified in the Claim.

74.     Plaintiffs have not waived or excused INSURER's non-performance of its obligations under the Policy.

75.     Plaintiffs have satisfied any and all preconditions to filing suit, or the same have been waived by the Defendants.

76.     At all times relevant hereto, INSURER has acted by and through its employees and

designated agents and representatives in its handling of the Claim.

## COUNT I – BREACH OF CONTRACT/NEGLIGENCE

1-76.   Plaintiffs repeat and re-allege rhetorical paragraphs 1-76, as if fully reincorporated herein.

77.   The INSURER Policy is a valid contract between Plaintiffs and INSURER.

78.   In addition to the provisions in the policy, amendments and endorsements, the Policy further includes additional provisions required by law, as well as an obligation by INSURER to exercise a covenant of good faith and fair dealing toward Plaintiffs.

79.   INSURER has breached its Contract with Plaintiffs in one or more of the following ways:

a.   Misrepresenting the terms and conditions of coverage;

b.   Deceiving Plaintiffs regarding its scope of loss and what it had agreed to pay;

c.   Unnecessarily delaying the investigation and determination of the scope of loss;

d.   Misrepresenting facts relating to the loss and INSURER's purported investigation thereof;

e.   Failing and refusing to pay for, or otherwise properly adjust Plaintiffs' damaged Property, without legal excuse or justification;

f.   Unnecessarily delaying the handling of the Claim, without legal excuse or justification;

g.   Failing to comply with its obligations under the INSURER Policy;

h.   Failing and refusing to pay Plaintiffs for their loss in accordance with the terms and conditions of the Policy;

i.   Failing and refusing to pay Plaintiffs in accordance with the replacement cost

coverage for which Plaintiffs paid; and

    j.   Failing to exercise good faith and fair dealing in its handling of Plaintiffs' Claim.

80.    INSURER further negligently failed to exercise reasonable care in the handling of Plaintiffs' claim.

81.    The Policy includes a limitation for filing suit as follows:

The Legal Action Against Us Condition is replaced

by the following:

LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Part unless:

1.    There has been full compliance with all of the terms of this Coverage Part; and

2.    The action is brought within 3 years after the date on which the direct physical loss or damage occurred.

82.    As a direct and proximate result of the INSURER's breach of contract and/or negligence in handling Plaintiffs Claim, Plaintiffs have suffered consequential damages, including but not limited to:

    A.   The loss of property without indemnification and/or replacement cost provided for in the policies;

    B.   The loss of use of property and other insurance benefits;

    C.   The increased cost to repair and/or replace the property insured; and

    D.   Other consequential damages.

WHEREFORE, Plaintiffs MAYA HOTEL, INC. ("MAYA"), RUXMANI HOTELS, INC. ("RUXMANI") and SHARDAMAYA, INC. ("SHARDAMAYA") d/b/a COMFORT INN

Case 7:21-cv-00154-M   Document 1   Filed 09/14/21   Page 16 of 21

UNIVERSITY, by counsel, respectfully requests judgment in its favor and against defendant OWNERS INSURANCE CO, and further requests the following relief:

    A.  For the payment of all proceeds available and due under the Policy;

    B.  For all reasonable compensatory and consequential damages;

    C.  For recoverable pre-judgment and post-judgment interest; and recoverable attorney fees and costs, and

    D.  For all other just and proper relief in the premises.

### COUNT II – BAD FAITH/BREACH OF COVENANT OF GOOD FAITH

1-82.   Plaintiffs repeat and re-allege rhetorical paragraphs 1-82, as if fully reincorporated herein.

83.     In addition to breaching its contract with Plaintiffs, INSURER further breached its covenant of good faith and fair dealing with Plaintiffs in one or more of the following manners:

    a.   By making an unfounded refusal to pay policy proceeds to Plaintiffs;

    b.   By causing an unfounded delay in making payment to Plaintiffs;

    c.   By misrepresenting the terms and conditions of coverage under their respective policy;

    d.   By deceiving Plaintiffs regarding what it had agreed to pay;

    e.   By failing and refusing to pay for necessary demolition and mitigation work that it had previously agreed to;

    f.   By unnecessarily delaying the investigation, adjustment and/or determination of the scope of loss;

    g.   By misrepresenting facts relating to the loss and defendants' purported investigation thereof;

h.    By failing and refusing to pay for, or otherwise properly adjust Plaintiffs damaged property, without legal excuse or justification;

i.    By unnecessarily delaying the handling of the Claim, without legal excuse or justification;

j.    By failing and refusing to comply with its obligations under the Policy;

k.    By failing and refusing to properly inspect or investigate the nature and extent of damage to the roof;

l.    By failing and refusing to comply with the appraisal provision of the Policy;

m.    By attempting to exercise any unfair advantage to pressure Plaintiffs into a settlement of its claim;

n.    By compelling Plaintiffs to institute litigation to protect its policy benefits due under the policy; and

o.    By otherwise failing and refusing to exercise good faith and fair dealing in its handling of COMFORT INN's Claim.

84.    INSURER's actions were made in bad faith and/or a breach of the covenant of good faith and fair dealing to Plaintiffs and have resulted in additional injury and damage to Plaintiffs, including but not limited to consequential damages.

WHEREFORE, Plaintiffs MAYA HOTEL, INC. ("MAYA"), RUXMANI HOTELS, INC. ("RUXMANI") and SHARDAMAYA, INC. ("SHARDAMAYA") d/b/a COMFORT INN UNIVERSITY, by counsel, respectfully requests judgment in its favor and against defendant OWNERS INSURANCE CO, and further requests the following relief:

A.    For all reasonable compensatory and consequential damages at law;

B.    For all recoverable punitive damages at law;

C. For recoverable pre-judgment and post-judgment interest; and recoverable attorney fees and costs; and

D. For all other just and proper relief in the premises.

## COUNT III – STATUTORY VIOLATIONS

1-84. Plaintiffs repeat and re-allege rhetorical paragraphs 1-84, as if fully reincorporated herein.

85. INSURER's actions toward Plaintiffs violate N.C. Gen. Stat. §§58-63-15(11) and 75-1.1.

86. INSURER's actions in violation of N.C. Gen. Stat. §§58-63-15(11) and 75-1.1 caused Plaintiffs further injury, damage, and harm.

WHEREFORE, Plaintiffs MAYA HOTEL, INC. ("MAYA"), RUXMANI HOTELS, INC. ("RUXMANI") and SHARDAMAYA, INC. ("SHARDAMAYA") d/b/a COMFORT INN UNIVERSITY, by counsel, respectfully requests judgment in its favor and against defendant OWNERS INSURANCE CO, and further requests the following relief:

A. For all reasonable compensatory, consequential and damages at law;

B. For all recoverable punitive damages at law;

C. For recoverable pre-judgment and post-judgment interest; and recoverable attorney fees and costs; and

D. For all other just and proper relief in the premises.

## COUNT IV – DECLARATORY JUDGMENT

1-86. Plaintiffs repeat and re-allege rhetorical paragraphs 1-86, as if fully reincorporated herein.

87.     Pursuant to the Policy and North Carolina law, Jones is not an impartial appraiser and should be precluded from participating in any appraisal process before it goes forward.

88.     Furthermore, since the appraisal process cannot determine the scope of loss and coverage, any appraisal going forward cannot address such issues.

89.     Accordingly, Plaintiffs request that to the extent that an appraisal goes forward, that this Court first require INSURER to appoint a new, impartial, and competent appraiser, and preclude the appraisal process from determining issues relating to the scope of loss and coverage.

### JURY TRIAL DEMAND

90.     Plaintiffs respectfully request a trial by Jury on all triable claims.


WHEREFORE, Plaintiffs MAYA HOTEL, INC. ("MAYA") and SHARDAMAYA, INC. ("SHARDAMAYA") d/b/a COMFORT INN UNIVERSITY, by counsel, respectfully requests judgment in its favor and against defendant OWNERS INSURANCE CO, and further requests the following relief:

A.  That this Court declare that to the extent that the disputes between the parties herein relate to the scope of loss or coverage, that either no appraisal proceed or that the appraisal be appropriately limited;

B.  That to the extent that an appraisal does proceed, that it neither delay nor impede the litigation of Plaintiffs' other claims, and that defendant be ordered to appoint a new, impartial, and competent appraiser before the appraisal process proceeds; and

C.  For all other just and proper relief in the premises.

Respectfully submitted this 14 day of September 2021.

/s/ Inez de Ondarza Simmons
Inez de Ondarza Simmons
North Carolina State Bar No. 34303
**DE ONDARZA SIMMONS PLLC**
4030 Wake Forest Road, Suite 319
Raleigh, North Carolina 27609
Telephone: (800) 678-9440
Fax: (919) 277-7120
Email: Inez@DeOndarzaSimmons.com
Local Rule 83.1 Counsel for Plaintiff